IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore

Criminal Action No. 14-cr-00401-RM-1

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. KATHERINE NOLAND,

    Defendant.

---

**RESPONSE TO PRESENTENCE INVESTIGATION REPORT BY DEFENDANT**

---

Defendant Katherine Noland has no objections to the advisory sentencing guideline calculations or the factual content of the Presentence Investigation Report (hereinafter PSIR). Ms. Noland is appreciative of the thoroughness of the report and the probation officer's sentencing recommendation. She has no corrections or additions to add to the report, and again, she expresses her thanks to the probation officer for the recommendations made in the PSIR and for the fairness of the report.

The defense would like to address, however, the sentencing recommendation of electronic monitoring as a special condition of probation. Defense maintains that the electronic monitoring component of the home detention condition is not necessary to achieve the sentencing goals set forth in 18 U.S.C. §3553 for the following reasons:

1. As noted in the PSIR, Ms. Noland recently turned 19 years of age. Her only prior involvement with law enforcement and the court system was a 2012 conviction for

Underage Possession or Consumption of Alcohol at age 16. Although she did not graduate from high school, this extremely talented young girl obtained full-time employment as a web developer earning $30.00 per hour. She has lived on her own for the past several years and has no substance abuse issues. The PSIR further indicates that she currently lives in a small one-bedroom, three window's (which don't open), apartment which is sparsely furnished and decorated. The apartment has only the bare necessities for daily life. Given Ms. Noland's living conditions, a special condition of home detention with electronic monitoring would be unduly punitive. She would be required to remain in this small apartment at all times with no option to go outside, "except for approved absences for gainful employment, community service, religious services, medical care, educational or training programs…" (Application Note 1 to Sentencing Guideline 5F1.2). Being confined in a small 27th floor apartment is significantly more severe, for example, than a person serving a period of home detention who resides in a multi-room 2,500 square foot home.

2. The primary goals of electronic monitoring are to ensure that offenders comply with the terms of their supervision, to track offenders, reduce recidivism, and protect the public from further crimes of the offender. Ms. Noland has no history of absconding or failing to comply with previous terms of probation or supervised release because Ms. Noland has no adult arrest record. And most importantly, without fail she has complied with all the conditions of her pretrial release from October 15, 2014, until present, a period of some 8 months. Finally, the public does not need protection from this 19 year-old girl.

3. The stated goals of electronic monitoring are not applicable in Ms. Noland's

case. The U.S. Department of Justice, Office of Justice Programs, *National Institute of Justice* published an article in September 2011 titled *Electronic Monitoring Reduces Recidivism*. The article concludes: "Many probation officers thought the courts should concentrate monitoring efforts on high-risk offenders who pose the most risk to the public."[1] The defense agrees with the conclusion of this DOJ article, and maintains that Defendant Katherine Noland is not a "high-risk" offender

4. The PSIR notes that Ms Noland has a positive monthly cash-flow of $649. The current daily cost of electronic monitoring is $1.89 or $56.70 per month. She would also be required to obtain a dedicated land-line to facilitate the electronic monitoring equipment at a cost of approximately $60 per month. The total monthly cost for electronic monitoring would be in excess of $110. The defense maintains that these monies would be better utilized if they were applied to the $20,000 restitution, if ordered, as opposed to an unnecessary surveillance/monitoring program.

5. Should the Court believe that some additional form of punishment is nevertheless required in this case, the defense would request that the Court impose a six-month curfew without electronic monitoring. The curfew hours can be established by the probation officer and the curfew can be enforced by the probation office through random telephone calls and home contacts. However, the defense believes that a term of five years probation is sufficient in and of itself to comply with the sentencing factors reflecting the seriousness of the offense, promoting respect for the law, affording adequate deterrence, and protecting the public from further crimes.

---

1. Undersigned counsel's investigator, Mr. Kurt Thoene, whose firm is Defense Case Management and Mitigation Services LLP, has provided this material and argument to counsel for this response. The article is attached hereto as Exhibit 1 for reference.

6. Undersigned counsel has requested that Assistant U.S. Attorney Michele Korver state her position on the ankle bracelet issue, but she has been unavailable at this date. Based on earlier conversations between counsel, it is believed that Ms. Korver will have no objection to the foregoing.

WHEREFORE Defendant Katherine Noland respectfully submits this Response to the Presentence Investigation Report.

Dated: May 28, 2015.    s/ Richard N. Stuckey
Richard N. Stuckey, Attorney at Law
1801 Broadway, Suite 1100
Denver, CO  80202
303-292-0110
FAX: 303-292-0522
Email: dick@richardstuckeylaw.com
Attorney for Defendant Katherine Noland

CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2015, I electronically filed the foregoing Entry of Appearance with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses of all counsel entered in this case.

s/Richard N. Stuckey
Richard N. Stuckey, Attorney at Law, PC
1801 Broadway, Suite 1100
Denver, CO 80202-3839
Office Phone: 303-292-0110
Fax Phone: 303-292-0522
E-mail dick@richardstuckeylaw.com
Attorney for Defendant Katherine Noland

**U.S. Department of Justice**
Office of Justice Programs
*National Institute of Justice*





## SHORT
### TOWARD CRIMINAL JUSTICE SOLUTIONS

SEPT. 2011

NCJ 234460

# Electronic Monitoring Reduces Recidivism

A large NIJ-funded study of Florida offenders placed on electronic monitoring found that monitoring significantly reduces the likelihood of failure under community supervision. The decline in the risk of failure is about 31 percent compared with offenders placed on other forms of community supervision.

Researchers from Florida State University's Center for Criminology and Public Policy Research compared the experiences of more than 5,000 medium- and high-risk offenders who were monitored electronically to more than 266,000 offenders not placed on monitoring over a six-year period. The researchers worked with the Florida Department of Corrections to secure approval, obtain administrative data, and gain help in contacting local probation offices for interviews. The researchers interviewed offenders, probation officers, supervisors and administrators to uncover insights into the electronic monitoring process.

### Increasing Use of Electronic Monitoring

States now use electronic monitoring in a wide variety of settings, such as a pretrial supervision alternative to jail, an alternative to imprisonment for some offenders, and a mandated supervision requirement for some felons released from prison. Some states now mandate electronic monitoring for released sex offenders. More than 5 million offenders in the United States are under some form of community supervision, according to the Bureau of Justice Statistics. Electronic monitoring may increase over time as states seek less expensive alternatives to imprisonment. The cost of imprisonment is about six times higher than the cost of electronic monitoring.[1]

Florida has used electronic monitoring of released felons for decades, mostly on higher risk offenders. The first home confinement program that used electronic monitoring started in Florida's Palm Beach County in 1984. At the end of June 2009, the state had 143,191 offenders on supervision, including 2,392 under electronic monitoring.

To assess the impact of electronic monitoring, researchers gathered information on people under supervision between June 1, 2001, and June 30, 2007. Using Florida's risk classifications, the research focused on medium- and high-risk offenders. The sample included 5,034 medium- and high-risk offenders on electronic monitoring and 266,991 offenders who were not placed on electronic monitoring. In addition, the researchers interviewed 105 offenders. Offenders were selected for interviews using convenience sampling. Visits were made to geographically strategic probation offices throughout Florida during reporting week for offenders. Probation officers referred offenders to the researchers in a private room to receive an explanation of the study, consent process and interview. The interviewed sample included mostly medium- and high-risk offenders. Of this group, 97 percent were under electronic monitoring; the rest had been on monitoring devices before the interview. The researchers also interviewed 36 probation officers who oversee such offenders and 20 administrators who oversee the program.



DEFENDANT'S EXHIBIT

Office of Justice Programs ■ Innovation • Partnerships • Safer Neighborhoods ■ *www.ojp.usdoj.gov*

## Overall Findings

The quantitative analysis showed significant decreases in the failure rate for all groups of offenders, and the decreases were similar for all age groups. More specifically, the analysis showed that:

- Electronic monitoring reduces offenders' risk of failure by 31 percent.
- Electronic monitoring based on Global Positioning Systems (GPS) typically has more of an effect on reducing failure to comply than radio frequency (RF) systems.
- Electronic monitoring had less of an impact on violent offenders than on sex, property, drug and other types of offenders. However, the effect remains statistically significant.

The qualitative analysis revealed various perceptions about electronic monitoring. For administrators, the primary goals of the electronic monitoring program are to ensure that offenders comply with the terms of their supervision, track offenders, reduce recidivism and protect the public. Overall, administrators say that although electronic monitoring has achieved these goals, they also see ways to improve the system. In addition, they see monitoring as a tool that helps probation officers do their jobs, not as a replacement for personal contact with offenders. Sometimes the offenders and officers voiced different opinions. For example, 85 percent of offenders said electronic monitoring does not affect the likelihood that they would abscond. In contrast, 58 percent of officers thought electronic monitoring made it less likely that an offender would abscond.

## Perceptions of the Effects on Personal Relationships

Many probation officers and offenders believe that monitoring has a negative impact on offenders' relationships with their spouses, children and friends. Some 43 percent of the offenders believed monitoring had a negative impact on their partners because it created an inconvenience. Of the officers interviewed, 89 percent felt that offenders' relationships with their significant others changed because of being monitored.

In addition, most offenders said they felt a sense of shame about being under electronic monitoring and felt they were unfairly stigmatized. Some said media reports about monitoring focus mostly on sex crimes, which may lead the public to believe that everyone who is monitored is a sex offender. One offender said the electronic monitoring system "serves as a scarlet letter." Another reported, "Every time it goes off, we think the police are coming to arrest me." Perhaps the most poignant comments concerned the effects on children. One offender said, "I've got a child who straps a watch on his ankle to be like daddy." Another said, "When it beeps, the kids worry about whether the probation officer is coming to take me to jail. The kids run for it when it beeps."

## Perceptions of the Effects on Employment and Housing

Offenders and officers alike were almost unanimous in their belief that the visibility of the monitoring systems makes it much more difficult for offenders to obtain and keep a job. Offenders told stories of job interviews taking on a different tenor as soon as an interviewer noticed the devices. In addition, sometimes the systems would issue an alarm because the signal had been lost when offenders were inside a building. They would then have to take a break from work and walk outside, often for 15 minutes, before the signal was reestablished. This did not please employers. Of the offenders interviewed, 22 percent said they had been fired or asked to leave a job because of electronic monitoring. Of that group, 32 percent assigned the cause to signal loss. Others cited various reasons, such as limits on their flexibility (related to work hours or distance from work). Five percent said they were fired because their bosses did not want customers to see the monitoring devices.

Electronic monitoring did not deter offenders from finding housing. However, the various residency controls on sex offenders did have an impact.

Some courts mandate that offenders repay the state for the cost of electronic monitoring. Offenders often had trouble paying. The monthly costs determined by the court were waived for 39 percent of the offenders. Among the remaining 61 percent of offenders who were ordered to pay, 53 percent were not paying each month. The average monthly cost paid by offenders was $64.

## How Electronic Monitoring Works

Electronic monitoring was approved by the Florida legislature in 1987, and the Florida Department of Corrections started using RF systems in 1988 for house arrest cases where offenders were required to be home during certain hours of the day. RF systems use a device that alerts supervising officers when offenders violate home curfews. An RF ankle bracelet worn by the offender communicates with a base unit connected to the landline at the offender's home. The unit alerts a monitoring center when the offender moves beyond a predetermined distance from the base unit during specific times.

Florida started using GPS technology in 1997. This technology uses global positioning satellites to track offenders' movements in real time. Offenders wear an ankle bracelet that communicates with a

larger device that they must carry. The device is about 5 inches wide, 2 inches thick and 5 inches tall and must be visible. It is a distinctive piece of equipment that is noticed by others. The monitoring device communicates with a satellite and sends a signal to a monitoring center using a cell phone system. The device also has a screen that displays messages from supervising officers, who are able to track the exact location of offenders on a computer screen and see when they enter restricted zones. Officers can set up exclusion zones for various purposes. For example, they may set up an exclusion zone around a victim's house or place of work. Sex offenders may be required to avoid locations such as daycare centers or schools. The system sends an alert to a supervising officer if the offender enters an exclusion zone.

A third type of monitoring is passive GPS. These systems store GPS data throughout the day and then send a day's worth of information to a supervising officer. Florida started using this technology in 2001 but ended it in 2006 because of the cost.

### Outlook

Many probation officers thought the courts should concentrate monitoring efforts on high-risk offenders who pose the most risk to the public.

About a third of the offenders would have served time in prison if the electronic surveillance alternative had not been available. Thus, the monitoring gives offenders much more freedom despite any drawbacks involved in wearing a visible device. Given the cost savings involved, policymakers may want to consider expanding monitoring programs.

The complete report is available at http://www.ncjrs.gov/pdffiles1/nij/grants/230530.pdf.

### For More Information

- **NIJ's Corrections website:** http://www.nij.gov/topics/corrections
- **Electronic Monitoring Resource Center,** funded by NIJ: https://emresourcecenter.nlectc.du.edu/
- **National Law Enforcement and Corrections Technology Center, Justice Technology Information Network (Justnet):**
  - **Community Corrections:** http://www.justnet.org/pages/Topic.aspx?opentopic=46&topic=47
  - **Corrections Technology Center of Excellence:** http://www.justnet.org/corrections_coe/pages/home.aspx

### Note

1. William Bales, Karen Mann, Thomas Blomberg, Gerry Gaes, Kelle Barrick, Karla Dhungana and Brian McManus, "A Quantitative and Qualitative Assessment of Electronic Monitoring," January 2010, p. 150, final report submitted to NIJ, grant no. 2007-IJ-CX-0017, NCJ 230530.

This document is not intended to create, does not create, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Opinions or points of view expressed in this document represent a consensus of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice. The products and manufacturers discussed in this document are presented for informational purposes only and do not constitute product approval or endorsement by the U.S. Department of Justice.